Cabot Christianson, Esq.
Alaska Bar No. 7811089
LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 W. 8th Avenue, Suite 201
Anchorage, Alaska 99501
(907) 258-6016
cabot@cclawyers.net

Attorneys for Debtor

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | ) |
| | ) |
| ALASKA DISPATCH NEWS, LLC, | )   **Case No.: 17- 00285** |
| | )   Chapter 11 |
| Debtor. | ) |

## DEBTOR'S MOTION TO APPROVE DEBTOR IN POSSESSION
## LOAN AGREEMENT; AND TO APPROVE USE OF CASH COLLATERAL

Alaska Dispatch News, LLC ("Debtor" or "ADN") applies for approval of the

*Debtor-In-Possession Credit Agreement* ("DIP Loan Agreement"), Exhibit A hereto,

entered into between Debtor and Binkley Company, LLC ("Binkley"), and for use of

cash collateral as described herein.

### Background

Debtor operates the largest newspaper in Alaska. Recent operating losses, and an

eviction action filed by landlord GCI Communications have put ADN on the operational

and financial brink, as set forth in more detail the *Declaration of Alice Rogoff*, Docket

No. 12, ("the Declaration"). ADN filed Chapter 11 on Saturday, August 12, 2017.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

The Chapter 11 was filed in order to effect a sale of the newspaper.  Filed herewith is a motion (the "Sale Motion") to sell the newspaper assets, free and clear of lies, according to the terms of an Asset Purchase Agreement ("APA") entered into between Debtor as seller and Binkley as buyer.

Debtor lacks the financial resources to operate without additional funding. Binkley is willing to lend funds to the Debtor up to $1,000,000 on the terms set forth in the DIP Loan Agreement, so that the newspaper is still operating at the time of a hearing on the Sale Motion.

### Description of the DIP Loan Agreement

Section 3.03 of the DIP Loan Agreement sets forth the schedule of disbursements. There will be a $350,000 disbursement on the day following entry of an order ("the DIP Order") approving the agreement.  Subsequent disbursements of up to $200,000 a week are conditioned upon entry of an order approving a "breakup fee" and expense reimbursement. Section 3.03 provides:

> **Section 3.03  Advance Procedure.**  Lender will provide Debtor with a loan of $350,000 on the day following the entry of the DIP Order. Lender will provide additional loans of up to $200,000 starting the day following entry of any subsequent order approving the "breakup fee" and expense reimbursement conditions in this DIP Agreement, and then on each seventh day following that date  for a total commitment of $1,000,000, subject to entry of the DIP Order and satisfaction of conditions set forth below in Section 3.09.

The breakup fee referenced in this Section 3.03 is 3% of the final sale price, and expense reimbursement of up to $100,000, as set forth in Section 2.4 of the APA.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

The reason for Court approval of this breakup fee and expense reimbursement prior to Binkley lending funds subsequent to the first $350,000 advance, is to protect Binkley in the event that another interested party outbids Binkley at the hearing on the Sale Motion.  The parties recognize that Binkley's $350,000 and subsequent advances are at risk in the event that, for any number of reasons, the sale does not occur at all, and further that even if Binkley is not the eventual high bidder, Binkley's initial $1 million offer to purchase will have brought prospective bidders forward who were willing to pay more than $1 million for the newspaper, but not take the risk of advancing essentially the entire purchase price prior to being assured that they would own the newspaper. Additionally, as the first bidder, Binkley incurred significant professional and due diligence expenses that other bidders will not incur, because Binkley will have essentially paved the way.

Section 3.10 of the DIP Loan Agreement gives Binkley wide discretion to cease making advances to the Debtor, before the $1 million cap is reached:

> **Section 3.10  Prerequisites to each subsequent advance.**  Lender in its sole judgment, may choose to not loan Debtor any of the subsequent loan advances if Binkley Company concludes: (i) it is unlikely to reach agreement with any Lien creditor concerning release of collateral, (ii) it is unlikely to reach agreement with any lessor concerning continued occupancy of lessor's property or release of Collateral in lessor's property, (iii) it is unlikely to reach agreement with essential vendors of the Debtor, (iv) it is unlikely to obtain within a period of time acceptable to Lender, Bankruptcy Court orders which resolve Lender's concerns expressed in this Section, or (v) its condition that it receive a "breakup fee" and expense reimbursement if it is not the final purchaser of the Debtor's assets is not first approved by the Court.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

Section 3.09 of the DIP Loan Agreement provides that Binkley receives a priming

lien, in first position ahead of all other secured indebtedness:

> **Section 3.09  Security and Priority.**  As provided in the DIP Order,
> all indebtedness and DIP Obligations under this Agreement and the
> DIP Loan Documents shall be secured by automatically perfected first
> priority security interests and Liens granted pursuant to Section 364(c)
> and 364(d)(1) of the Bankruptcy Code on all Collateral.  The security
> interest here granted is superior to any interests in the Collateral, and,
> specifically, is superior to any interests of creditors  Northrm Bank and
> J Birket, Inc.

### Proposed use of cash collateral

Attached hereto as Exhibit B showing Debtor's proposed use of cash for the next

several weeks.  This cash consists of Debtor's own cash, plus the funds received from

Binkley.

### Description of existing security interests in cash collateral

There is one known security interest against Debtor's accounts receivable, and

that is in favor of Northrim Bank, which holds a broad-form UCC-1 against accounts.

See Exhibit B.  Northrim is owed approximately $10 million.

Northrim's security interest in accounts implicates both the portion of this motion

that seeks approval of the DIP Loan, and the portion that seeks approval for use Debtor's

existing cash and working capital.  Section 363(b) of the Bankruptcy Code requires, as a

condition of use of cash collateral, either the consent of creditors secured on that cash

collateral, or a court order.  Section 364(d)(1) provides that a Chapter 11 debtor may

obtain a priming lien to secure post-petition financing, provided that debtor has no other

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

alternative and that the debtor provide adequate protection to the holder of any security interest in cash collateral.

Giving Binkley a priming lien that puts Northrim's existing security interest in second position raises the issue of adequate protection to Northrim. Because this Chapter 11 was filed on a Saturday evening, and this motion is being filed the following Tuesday, the parties have not had sufficient time to reach agreement on Northrim's adequate protection.

This motion assumes that Northrim will consent to the relief sought herein. If this assumption proves to be incorrect, Debtor will supplement this motion.

**Notice**

Because it is essential that Debtor receive the first $350,000 disbursement of funds this week, this motion is accompanied by a motion that it be heard on shortened time, with notice to be given as described in that motion.

**Conclusion**

Debtor requests that this Court approve the relief sought herein. Exhibit D is a proposed order approving the DIP Loan Agreement, and Exhibit E is a proposed order granting use of cash collateral.

DATED August 15, 2017.

LAW OFFICES OF
CABOT CHRISTIANSON, PC

By:      /s/ Cabot Christianson
        Cabot Christianson

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

*List of Exhibits*

A       Debtor-in-Possession Credit Agreement ("DIP Loan Agreement")
B       Budget
C       UCC-1 filed by Northrim Bank
D       Order approving DIP loan agreement
E       Order approving use of cash collateral

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 15, 2017, a correct copy of this application was served by electronic means through the ECF system as indicated on the Notice of Electronic filing.

By:   /s/ Margaret Stroble
              Margaret Stroble

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this Agreement) dated as of August  12, 2017,  between ALASKA DISPATCH NEWS, LLC. ("Debtor"), a corporation organized and existing under the laws of the State of Alaska and BINKLEY COMPANY LLC, ("Lender" or "Binkley Company") a limited liability company organized and existing under the laws of the State of Alaska.

## RECITALS

A.   The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") with the United States Court for the District of Alaska (the "**Court**") on August        , 2017 (the "**Petition Date**") and is continuing to operate its business and manage its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

B.   Binkley Company, LLC has offered to purchase the assets of Debtor

C.   Debtor has agreed to sell its assets to Binkley Company under 11 U.S.C. 363 but Debtor does not hold sufficient funds to operate pending approval of its motion to sell to Binkley Company. LLC

D.   The parties agree that were Debtor to cease operations, even for a short period of time, the value of its assets would substantially diminish.

E.   The Debtor has requested that Lender make a  DIP Loan (as  hereinafter defined) to the Debtor on a secured basis to allow Debtor to continue its operations as a debtor in possession under the Bankruptcy Code, subject to the terms and conditions set forth herein; and

F.   Lender is willing, on the terms and conditions hereinafter set forth, to make such a DIP Loan;

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01**   For purposes of this Agreement, the following capitalized terms shall have the following meanings (such definitions to be equally applicable to the singular and the plural form thereof).

The terms "**Account**", "**Chattel Paper**", "**Deposit Account**", "**Document**", "**Equipment**", "**General Intangible**", "**Goods**", "**Instrument**", "**Inventory**", "**Investment Property**", "**Payment Intangible**", "**Proceeds**", have the respective meanings ascribed thereto in Article 9 of the UCC.

"**Advance**" shall mean each advance of funds by Lender to the Debtor pursuant to the terms and conditions of this Agreement.

"**Advance Request**" shall mean a written request by the Debtor for an Advance in accordance with Section 3.02, in the form of Exhibit A hereto.

"**Asset Purchase Agreement**" shall mean that agreement between Debtor and Binkley Company providing for the purchase of Debtor's assets by Binkley Company.

"**Availability Period**" shall mean the period from the date hereof up to, but not including, the Maturity Date.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as may hereafter be amended from time to time.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as promulgated under 28 U.S.C. § 2075, as may be amended from time to time.

"**Business Day**" shall mean any day that both LENDER and the depository institution LENDER utilizes for funds transfers hereunder are open for business.

"**Chapter 11 Case**" shall mean the voluntary bankruptcy case of the Debtor.

"**Collateral**" has the meaning given such term in Section 4.01 hereof.

"**DIP Loan**" has the meaning given such term in Section 3.01 hereof.

"**DIP Loan Commitment**" shall mean the commitment of Lender to make DIP Loans to the Debtor in an aggregate principal amount not to exceed $1,000,000.00.

"**DIP Loan Documents**" shall mean, collectively, this Agreement, the DIP Order, and each other order of the Court and each other instrument, document or agreement required to be delivered pursuant to this Agreement or any order of the Court or delivered in connection with this Agreement, in each case as amended, modified, waived, substituted, replaced or extended from time to time.

"**DIP Order**" shall mean the final order entered by the Court with respect to the DIP Loan or the DIP Loan Commitment, in form and substance satisfactory to Lender in its sole discretion approving the DIP Loan and the DIP Loan Documents.

"**Effective Date**" shall mean the date designated as such by Lender on the signature page hereof.

"**Environmental Laws**" shall mean all laws, rules and regulations promulgated by any

Governmental Authority, with which the Debtor is required to comply, regarding the use, treatment, discharge, storage, management, handling, manufacture, generation, processing, recycling, distribution, transport, release of or exposure to any Hazardous Material.

**"Event of Default"** shall have the meaning as described in Article VII hereof.

**"GAAP"** shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board.

**"Governmental Authority"** shall mean the government of the United States of America, any other nation or government, any state or other political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

**"Hazardous Material"** shall mean any (a) petroleum or petroleum products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, lead and radon gas, and (b) any other substance designated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

**"Lien"** shall mean any statutory or common law consensual or non-consensual mortgage, pledge, security interest, encumbrance, lien, right of set off, claim or charge of any kind, including, without limitation, any conditional sale or other title retention transaction, any lease transaction in the nature thereof and any secured transaction under the Uniform Commercial Code.

**"Maturity Date"** shall mean the date 30 days from the Effective Date.

**"Obligations"** shall mean any and all liabilities, obligations or indebtedness owing by the Debtor to Lender, arising from, by virtue of, or pursuant to this Agreement, any DIP Loan Documents, and any and all renewals and extensions thereof or any part thereof, or future amendments thereto, of any kind or description, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

**"Payment Date"** shall mean the last day of each month this Agreement is in effect.

**"Permitted Liens"** shall mean:

(a)     Liens created pursuant to the DIP Loan Documents and authorized by the DIP Order;

(b)     the Lien of Northrim Bank pursuant to its security agreements, as the same may have been or shall be modified by the court in the Chapter 11 Case;

(d)     Liens for taxes, assessments and other governmental charges which are not delinquent;

(e)     Liens for taxes, assessments and other governmental charges already delinquent which are currently being contested in good faith by appropriate proceedings, PROVIDED the

Debtor shall have set aside on its books adequate reserves with respect thereto;

(f)    Liens in respect of judgments or awards with respect to which the Debtor shall in good faith currently be prosecuting an appeal;

(g)    any other Liens granted by the Debtor in favor of Lender, regardless of whether such Liens were or are granted prior to, on or after the date hereof.

**"Person"** shall mean natural persons, cooperatives, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, associations, companies, trusts or other organizations, irrespective of whether they are legal entities, and Governmental Authorities.

**"Principal Repayment Start Date"** for any DIP Loan shall mean the Payment Date in the month following the month in which such DIP Loan was made.

**"Security Agreement"** shall mean the terms of this Agreement which grant Lender a first position super-priority lien under 11 U.S.C. 364 in all of Debtor's assets senior to any current perfect lien in any or all of Debtor's assets.

**"UCC"** shall mean the Uniform Commercial Code as the same may from time to time be in effect in the Commonwealth of Alaska.

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES**

**Section 2.01**    The Debtor represents and warrants to Lender that as of the date of this Agreement:

**A.    Good Standing.**    The Debtor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing in those states in which it is required to be qualified to conduct its business.

**B.    Authority; Validity.**    Subject to the entry of the DIP Order, the Debtor has the power and authority (i) to enter into this Agreement, (ii) to make the borrowing hereunder (iii) to execute and deliver all documents and instruments required hereunder and (iv) to incur and perform the obligations provided for herein, all of which have been duly authorized by all necessary and proper action. Except for entry by the Court of the DIP Order, no consent or approval of any Person, including, as applicable and without limitation, members of the Debtor, which has not been obtained is required as a condition to the validity or enforceability hereof or thereof.

This Agreement and the Mortgage is, and when fully executed and delivered will be, subject to the entry by the Court of the DIP Order, legal, valid and binding upon the Debtor and enforceable against the Debtor in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity.

**D.    No Conflicting Agreements.**    Subject to the entry by the Court of the DIP Order,

the execution and delivery of the DIP Loan Documents and performance by the Debtor of the obligations thereunder, and the transactions contemplated hereby or thereby, will not: (i) violate any provision of law, any order, rule or regulation of any court or other agency of government, any award of any arbitrator, the articles of incorporation or by-laws of the Debtor, or any indenture, contract, agreement, mortgage, deed of trust or other instrument to which the Debtor is a party or by which it or any of its property is bound; or (ii) be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such award, indenture, contract, agreement, mortgage, deed of trust or other instrument, or result in the creation or imposition of any Lien (other than the Liens arising hereunder, under the DIP Order) upon any of the property or assets of the Debtor.

E.     **Taxes.**  The Debtor has filed or caused to be filed all federal, state and local tax returns which are required to be filed and has paid or caused to be paid all federal, state and local taxes, assessments, and governmental charges and levies thereon, including interest and penalties to the extent that such taxes, assessments, and governmental charges and levies have become due, except for such taxes, assessments, and governmental charges and levies which the Debtor is contesting in good faith by appropriate proceedings for which adequate reserves have been set aside.

F.     **Licenses and Permits.**  The Debtor has duly obtained and now holds all licenses, permits, certifications, approvals and the like necessary to own and operate its property and business that are required by Governmental Authorities and each remains valid and in full force and effect.

G.     **Litigation.**  Except for the Chapter 11 Case, or as disclosed in the Debtor's bankruptcy schedules or the Asset Purchase Agreement there are no outstanding judgments, suits, claims, actions or proceedings pending or, to the knowledge of the Debtor, threatened against or affecting the Debtor or any of its properties which, if adversely determined, either individually or collectively, would have a material adverse effect upon the business, operations, prospects, assets, liabilities or financial condition of the Debtor.  The Debtor is not, to the Debtor's knowledge, in default or violation with respect to any judgment, order, writ, injunction, decree, rule or regulation of any Governmental Authority which would have a material adverse effect upon the business, operations, prospects, assets, liabilities or financial condition of the Debtor.

H.     **Financial Statements.**  The financial statements of the Debtor including the balance sheet and the statement of operations of the Debtor all heretofore furnished to Lender, are complete and correct.  Said balance sheet fairly presents the financial condition of the Debtor as at said date and said statement of operations fairly reflects its operations for the period ending on said date. The Debtor has no contingent obligations or extraordinary forward or long-term commitments except as specifically stated in said balance sheet or herein.  There has been no material adverse change in the financial condition or operations of the Debtor since the Petition Date.

I.     **Debtor's Legal Status.**

(i)     The Debtor's exact legal name is Alaska Dispatch News, LLC;

(ii)    The Debtor's organizational type is: limited liability company;

(iii)    The Debtor's jurisdiction of organization is the State of Alaska;

(iv)    The Debtor's place of business is Anchorage, Alaska.

**J.    Required Approvals.**   Except for entry by the Court of the DIP Order, no license, consent or approval of any Governmental Authority is required to enable the Debtor to enter into this Agreement, or to perform any of its Obligations provided for in such documents.

**K.    Compliance With Laws.**   The Debtor is in compliance, in all material respects, with all applicable requirements of law and all applicable rules and regulations of each Governmental Authority.

**L.    Disclosure.**   To the Debtor's knowledge, information and belief, neither this Agreement nor any document, certificate or financial statement furnished to Lender by or on behalf of the Debtor in connection herewith (all such documents, certificates and financial statements, taken as a whole) contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained herein and therein not misleading.

**M.    No Other Liens.**   As to property which is presently included in the description of Collateral, the Debtor has not, without the prior written approval of Lender, executed or authenticated any security agreement, or filed or authorized any financing statement to be filed with respect to assets owned by it, other than (i) security agreements and financing statements in favor of Northrim Bank and possibly J. Birket

**N.    Environmental Matters.**   Except as to matters which individually or in the aggregate would not have a material adverse effect upon the business or financial condition of the Debtor, (i) the Debtor is in compliance with all Environmental Laws (including, but not limited to, having any required permits and licenses), (ii) there have been no releases (other than releases remediated in compliance with Environmental Laws) from any machinery, tanks or reservoirs owned or controlled by Debtor, (iii) the Debtor has not received written notice or claim of any violation of any Environmental Law, (iv) there is no pending investigation of the Debtor in regard to any Environmental Law, and (v) to the best of the Debtor's knowledge, there has not been any release or contamination (other than releases or contamination remediated in compliance with Environmental Laws) resulting from the presence of Hazardous Materials on property owned, leased or operated by the Debtor.

## ARTICLE III

## DIP LOAN

**Section 3.01   DIP Loan Commitment.**   Subject to and in accordance with the terms and conditions of this Agreement, Lender agrees that it shall make Advances for the account of the Debtor (each a "**DIP Loan**" and collectively, the "**DIP Loans**") up to the maximum principal amount of the DIP Loan Commitment.   The Debtor may borrow and repay funds at any time or from time during the Availability Period.   The amount of any funds repaid shall not be available for reborrowing

**Section 3.02   No Note.**  This Agreement, the DIP Loan Documents and the DIP Order fully evidence and memorialize the Obligations, and no other instrument is required to evidence such Obligations.

**Section 3.03   Advance Procedure.**  Lender will provide Debtor with a loan of $350,000 on the day following the entry of the DIP Order.  Lender will provide additional loans of up to $200,000 starting the day following entry of any subsequent order approving the "breakup fee" and expense reimbursement conditions in this DIP Agreement, and then on each seventh day following that date   for a total commitment of $1,000,000, subject to entry of the DIP Order and satisfaction of conditions set forth below in Section 3.09.

**Section 3.04   Use of Proceeds.** The proceeds of the DIP Loan shall be used to pay for the Debtor's operations to the extent such operations are not prohibited by the Court or by other applicable law.

**Section 3.05   Advance Disbursement.**  Each Advance shall be disbursed by Lender to Debtor's DIP Account, in accordance with the payment instructions identified therein, or if not identified therein, in accordance with the payment instructions for paying such invoice received from the Debtor.

**Section 3.06   Payment, Amortization and Interest Rate.**  The DIP Loan shall be payable and bear interest as follows:

**A.     Maturity; Amortization; Payment.**  The Debtor unconditionally promises and agrees to pay, as and when due, interest on all amounts advanced hereunder from the date of each Advance and to repay all amounts advanced hereunder with interest on the Maturity Date, if not sooner paid.

During the Availability Period, for each Advance, the Debtor shall promptly pay interest in the amount invoiced on each Payment Date until the Principal Repayment Start Date.   On the Principal Repayment Start Date, and on each Payment Date thereafter, the Borrower shall promptly pay the Principal Repayment Amount plus interest in the amounts invoiced.   If not sooner paid, any amount due on account of the unpaid principal, interest accrued thereon and fees, if any, shall be due and payable on the Maturity Date.

Lender shall invoice the Debtor at least five days prior to the due date of any payment, provided, however, that Lender's failure to timely send an invoice with respect to any interest payment shall not constitute a waiver by Lender or be deemed to relieve the Debtor of its obligation to make such payment as provided for herein or to repay all amounts advanced hereunder in full with accrued interest as provided for herein.    All amounts shall be payable at Lender's main office at 1062 Chena Pump Road, Fairbanks, Alaska 99709 or at such other location as designated by Lender from time to time.

**B.     Interest Rate; Computation.** The interest rate on all Advances will be 5% per annum continuously compounded.   Interest will be computed on the basis of a 365 day year for the actual number of days that any Advance is outstanding.

**C.     Application of Payments.**  Each payment shall be applied to the Obligations, first to any fees, costs, expenses or charges other than interest or principal, second to interest accrued

and the balance to principal.

**D.   Usury Savings Clause.**   No provision of this Agreement shall require the payment, or permit the collection, of interest in excess of the highest rate permitted by applicable law.

**Section 3.07   Optional Prepayment.**   The Debtor may at any time prepay any Advance, in whole or in part.

**Section 3.08   Default Rate.** If the Debtor defaults on its obligation to make a payment due hereunder by the applicable Payment Date, and such default continues for thirty days thereafter, then beginning on the thirty-first day after the Payment Date and for so long as such default continues, Advances shall bear interest at 8% per annum.

**Section 3.09   Security and Priority.**   As provided in the DIP Order, all indebtedness and DIP Obligations under this Agreement and the DIP Loan Documents shall be secured by automatically perfected first priority security interests and Liens granted pursuant to Section 364(c) and 364(d)(1) of the Bankruptcy Code on all Collateral.   The security interest here granted is superior to any interests in the Collateral, and, specifically, is superior to any interests of creditors Northrm Bank and J Birket, Inc.

**Section 3.10   Prerequisites to each subsequent advance.**   Lender in its sole judgment, may choose to not loan Debtor any of the subsequent loan advances if Binkley Company concludes: (i) it is unlikely to reach agreement with any Lien creditor concerning release of collateral, (ii) it is unlikely to reach agreement with any lessor concerning continued occupancy of lessor's property or release of Collateral in lessor's property, (iii) it is unlikely to reach agreement with essential vendors of the Debtor, (iv) it is unlikely to obtain within a period of time acceptable to Lender, Bankruptcy Court orders which resolve Lender's concerns expressed in this Section, or (v) its condition that it receive a "breakup fee" and expense reimbursement if it is not the final purchaser of the Debtor's assets is not first approved by the Court.

## ARTICLE IV

## COLLATERAL SECURITY

**Section 4.01   Grant of Security Interest in Collateral.** To secure the prompt and complete payment and performance of all of the DIP Obligations, the Debtor hereby pledges and grants to Lender, a continuing super priority lien under 11 U.S.C. 364 senior to Permitted Liens upon all Collateral of the Debtor including the lien of Northrim Bank and J Birket.   Such Lien shall have the priority as set forth in Section 3.09 hereof.

"Collateral" shall mean all property, assets, rights, privileges and franchises of the Debtor of every kind and description, real, personal or mixed, tangible and intangible, whether now owned or existing or hereafter created, acquired or arising (irrespective of whether the same existed on or was created or acquired after the Petition Date), including, but not limited to:

(a)   all Account, cash and accounts receivable;

(b)   all machinery, equipment, tools, fixtures, leasehold improvements, computer hardware, supplies, materials, Inventories, and other items of tangible personal property of every kind owned or leased by Seller;

(c)    all Intellectual Property (as defined in the Asset Purchase Agreement) including all rights to the names "Alaska Dispatch News," "Alaska Dispatch," "Anchorage Daily News," "The Anchorage Times," "ADN," and related derivations of each of the foregoing and all domain names;

d)    all of Seller's rights in and to all archives, files, documents, records, financial statements and data relating to the Business. After Closing, Seller will provide copies of Seller's tax returns to the extent reasonably required by Buyer

(e)    contracts, licensing agreement, IT contracts,  other use agreement which Buyer elects to acquire.

(f) the business name Alaska Dispatch News, LLC

(g) all General Intangibles (including all Payment Intangibles, Intellectual Property and Domain names);

(h)    all Instruments;

(i)    all Chattel Paper (whether tangible or electronic);

(j)    all Documents, subscriber lists, and archives;

(k)    all other Goods and personal property, whether tangible or intangible, wherever located, including money, letters of credit and all rights of payment or performance;

(l)    all other   personal property of the Debtor, whether tangible or intangible, and whether now owned or hereafter acquired;

(m)    all proceeds and products of any of the foregoing, in any form, including, without limitation, any claims against third parties for loss or damage to or destruction of any or all of the foregoing and to the extent not otherwise included, all (i) payments under insurance, or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral and (ii) cash.


**ARTICLE V**

**CONDITIONS OF LENDING**

**Section 5.01   Conditions Precedent to Initial Advance.**   The obligation of Lender to make the initial Advance hereunder shall not become effective until the date on which the following conditions precedent have been satisfied:

**A.    Legal Matters.**   All legal matters incident to the consummation of the transactions hereby contemplated shall be satisfactory to counsel for Lender.

**B.    Representations and Warranties.**   The representations and warranties contained in Article II shall be true on the date hereof.

**C.   Closing Deliverables.**  Lender shall have been furnished with the following, in form and substance satisfactory to Lender:

**(i)   DIP Order.**   Lender shall have received a copy of the DIP Order entered by the Court in form and substance acceptable to Lender and such DIP Order shall provide that Lender is a good faith Lender within the meaning of Section 364(e) and Section 363(m) of the Bankruptcy Code, and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended;

**(ii)   Documents.**  (a) the executed DIP Loan Documents, (b) certified copies of all such organizational documents and proceedings of the Debtor authorizing the transactions hereby contemplated as Lender shall require and (c) all other such documents as Lender may reasonably request.

**(iii)   UCC Filings.**  Lender shall have received evidence of the due filing, recordation or indexing of Uniform Commercial Code financing statements (and any continuation statements and other amendments thereto) in all jurisdictions necessary to provide Lender a perfected security interest, subject to Permitted Liens, in the Collateral which may be perfected by the filing of a financing statement, all in accordance with applicable law, and satisfactory evidence of the payment of all applicable taxes, recording and filing fees.

**(vi)   Requisitions.**  Lender shall have received an Advance Request with respect to the initial Advance.

**Section 5.02  Conditions to Subsequent Advances.**  Following the initial Advance, the obligation of Lender to make each subsequent Advance hereunder is additionally subject to satisfaction of the following conditions:

**A.   Requisitions.**  Lender shall have received an Advance Request with respect to such Advance.

**B.   Representations and Warranties; Default.**  The representations and warranties contained in Article II shall be true on the date of the making of each Advance hereunder with the same effect as though such representations and warranties had been made on such date; no Event of Default and no event which, with the lapse of time or the notice and lapse of time would become such an Event of Default, shall have occurred and be continuing or will have occurred after giving effect to each Advance on the books of the Debtor; there shall have occurred no material adverse change in the business or condition, financial or otherwise, of the Debtor; and nothing shall have occurred which in the opinion of Lender materially and adversely affects the Debtor's ability to perform its obligations hereunder.

**C.   Lease and Lien Resolution.**  Binkley Company has not concluded that: (i) it is unlikely to reach agreement with any Lien creditor concerning release of collateral, (ii) it is unlikely to reach agreement with any lessor concern continued occupancy of lessor's property or release of Collateral in lessor's property, (iii) it is unlikely to reach agreement with essential vendors of the Debtor, (iv) it is unlikely to obtain within a period of time acceptable to Lender, Bankruptcy Court orders whish resolve Lender's concerns expressed in this Section.

**D.   Entry of Order re: Cost and Breakup Fee.**  The Bankruptcy Court has entered an order allowing Binkley Company, if Debtor's assets are sold to a third party, a breakup fee of 3% of sale

proceeds, repayment of its DIP loan and repayment of its expenses to not exceed $100,000.

## ARTICLE VI

## EVENTS OF DEFAULT

**Section 6.01**  The following shall be "Events of Default" under this Agreement:

**A.    Bankruptcy Court.**  The occurrence of any of the following in the Bankruptcy Case:

(i)    The Chapter 11 Case shall be dismissed or converted from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the Debtor shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise;

(ii)    The Court shall enter an Order granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to any creditor or any other party as to any assets of the Debtor;

(iii)    (a) The Debtor shall fail to comply with the terms of the DIP Order, (b) the Debtor shall apply for authority to amend, supplement, stay, vacate or otherwise modify the DIP Order, (c) an order is entered that modifies or vacates the DIP Order, in each case without the written consent of Lender or (d) the DIP Order otherwise ceases to be in full force and effect;

(iv)    The Debtor shall file, support or fail to oppose a motion seeking, or the Court shall enter, an order (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code from any creditor other than Lender not otherwise permitted pursuant to this Agreement, (ii) granting any Lien upon or affecting any Collateral which are pari passu or senior to the Liens of Lender on the Collateral or other than Liens in favor of Lender, (iii) granting any claim priority senior to or pari passu with the claims of the Lender under the DIP Loan Documents or any other claim, other than claims in favor of Lender, having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, (iv) limiting, affecting or modifying any of Lender's rights with respect to the Obligations, including rights with respect to the Collateral and the priority thereof, except with the prior written consent of Lender or otherwise in favor of Lender or (v) granting any other relief that is adverse to the Lender's interest under any DIP Loan Document or its rights and remedies hereunder or its interest in the Collateral, except if such relief is otherwise in favor of Lender;

(v)    The Debtor shall file, support or fail to oppose a motion seeking, or the Court shall enter, an order appointing (x) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (y) a responsible officer or (z) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub clauses (3) and (4) of Section 1106(a) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(vi)     Except as permitted under the DIP Order, the Debtor shall file, support or fail to oppose a motion seeking, or the Court shall enter, an order for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens) against the Debtor, or any of its assets in the Chapter 11 Case to be pari passu with, or senior to, the Liens and claims of Lender granted and arising under the DIP Loan Documents.

## ARTICLE VII

## REMEDIES

**Section 7.01**   If any of the Events of Default listed in Section 7 hereof shall occur after the date of this Agreement and shall not have been remedied within the applicable grace periods specified therein, then Lender may:

(i)     Cease making Advances hereunder;

(ii)     Declare all unpaid principal outstanding on the DIP Loan, all accrued and unpaid interest thereon, and all other Obligations to be immediately due and payable and the same shall thereupon become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived;

(iii)     Pursue all rights and remedies available to Lender that are contemplated by   any other DIP Loan Documents in the manner, upon the conditions, and with the effect provided in any other DIP Loan Documents, including, but not limited to, a suit for specific performance, injunctive relief or damages;

(iv)     Pursue any other rights and remedies available to Lender at law or in equity.

Nothing herein shall limit the right of Lender to pursue all rights and remedies available to a creditor following the occurrence of an Event of Default.   Each right, power and remedy of Lender shall be cumulative and concurrent, and recourse to one or more rights or remedies shall not constitute a waiver of any other right, power or remedy.

## ARTICLE VIII

## MISCELLANEOUS

**Section 8.01  Notices.**  All notices, requests and other communications provided for herein including, without limitation, any modifications of, or waivers, requests or consents under, this Agreement shall be given or made in writing (including, without limitation, by email with confirmed receipt) and delivered to the intended recipient at the Address for Notices specified below; or, as to any party, at such other address as shall be designated by such party in a notice to each other party. All such communications shall be deemed to have been duly given (i) when personally delivered including, without limitation, by overnight mail or courier service, (ii) in the case of notice by United States mail, certified or registered, postage prepaid, return receipt requested, upon receipt thereof, or (iii) in the case of notice by email upon transmission thereof,

provided such transmission is promptly confirmed by recipient,. The Addresses for   Notices of
each of the respective parties is as follows:

    (b)    if to Seller Parties, to:

        Alaska Dispatch News, LLC
        AK Publishing, LLC
        & Alice Rogoff, Publisher
        3806 North Point Drive
        Anchorage, Alaska 99502
        mail: alice@alaskadispatch.com

        with a copy to:

        Birch Horton Bittner & Cherot
        Attention: William H. Bittner
        510 L Street, Suite 700
        Anchorage, AK 99501
        E-mail: wbittner@bhb.com

    (b)    if to Buyer

        Binkley Company, LLC
        Att: Ryan Binkley
        1062 Chena Pump Rd
        Fairbanks, Alaska 99700
        Email:  ryanbinkley@gmail.com

        with a copy to:

        Stoel Rives LLP
        Attention:   John D. Kauffman
        510 L Street, Suite 500
        Anchorage, Alaska 99501
        E-mail:   john.kauffman@stoel.com

        Erik LeRoy, P.C.
        500 L St., Ste 302
        Anchorage, Alaska 99501
        Email: erik@alaskanbankruptcy.com

    **Section 8.02  Expenses.**   The Debtor shall reimburse Lender for any reasonable costs
and out-of-pocket expenses paid or incurred by Lender (including, without limitation, reasonable
fees and expenses of outside attorneys, paralegals and consultants) for all actions Lender takes,
(a) to enforce the payment of any Obligation, to effect collection of any Collateral, or in preparation
for such enforcement or collection, (b) to institute, maintain, preserve, enforce and foreclose on

Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, (c) to restructure any of the Obligations, (d) to review, approve or grant any consents or waivers hereunder, (e) to prepare, negotiate, execute, deliver, review, amend or modify this Agreement, and (f) to prepare, negotiate, execute, deliver, review, amend or modify any other agreements, documents and instruments deemed necessary or appropriate by Lender in connection with any of the foregoing.

The amount of all such expenses identified in this Section 9.02 shall be secured by the Security Interest in collateral and shall be payable upon demand, and if not paid, shall accrue interest at the rated provided herein.

**Section 8.03 Lender Accounts.** The Debtor agrees that the records of, and all computations by, Lender (in whatever media they are recorded or maintained) as to the amount of principal, interest and fees due on the DIP Loan shall be conclusive in the absence of manifest error.

**Section 8.04  Waiver; Modification.**  No failure on the part of Lender to exercise, and no delay in exercising, any right or power hereunder or under the other DIP Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  No modification or waiver of any provision of this Agreement or the other DIP Loan Documents and no consent to any departure by the Debtor therefrom shall in any event be effective unless the same shall be in writing by the party granting such modification, waiver or consent, and then such modification, waiver or consent shall be effective only in the specific instance and for the purpose for which given.

**SECTION 8.05 GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.**

(A) THE PERFORMANCE AND CONSTRUCTION OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ALASKA.

(B) THE DEBTOR AND LENDER HEREBY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA TO THE EXTENT OF THAT COURT'S JURISDICTION OF ISSUES WHICH ARISE IN THE DEBTOR'S CASE AND UNDER THE TERMS OF THIS AGREEMENT.  TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ISSUES WHICH ARISE UNDER THE TERMS OF THIS AGREEMENT, THE DEBTOR AND LENDER SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES COURTS LOCATED IN ALASKA OR ANY STATE COURT SO LOCATED FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  TO THE EXTENT THE BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA DOES NOT HAVE JURISDICTION, THE DEBTOR IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTIONS THAT IT MAY NOW OR HEREAFTER HAVE TO THE ESTABLISHING OF THE VENUE OF ANY

SUCH PROCEEDINGS BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(C) THE DEBTOR AND LENDER EACH HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**SECTION 8.06 INDEMNIFICATION.** THE DEBTOR HEREBY INDEMNIFIES AND AGREES TO HOLD HARMLESS, AND DEFEND LENDER AND ITS MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS AND REPRESENTATIVES (EACH AN "INDEMNITEE") FOR, FROM, AND AGAINST ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, COSTS AND EXPENSES OF LITIGATION AND REASONABLE ATTORNEYS' FEES) ARISING FROM ANY CLAIM OR DEMAND IN RESPECT OF THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS, THE COLLATERAL, OR THE TRANSACTIONS DESCRIBED IN THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND ARISING AT ANY TIME, WHETHER BEFORE OR AFTER PAYMENT AND PERFORMANCE OF ALL OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS IN FULL, EXCEPTING ANY SUCH MATTERS ARISING SOLELY FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LENDER OR ANY INDEMNITEE. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN SECTION 8.06 HEREOF, THE OBLIGATIONS IMPOSED UPON THE DEBTOR BY THIS SECTION SHALL SURVIVE THE REPAYMENT OF THE DIP LOAN, THE TERMINATION OF THIS AGREEMENT AND THE TERMINATION OR RELEASE OF THE LIEN OF THE MORTGAGE.

**Section 8.7   Complete Agreement.** This Agreement, together with the schedules to this Agreement and the other DIP Loan Documents, and the other agreements and matters referred to herein or by their terms referring hereto, is intended by the parties as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement. In the event of any conflict in the terms and provisions of this Agreement and any other DIP Loan Documents, the terms and provisions of this Agreement shall control.

**Section 8.8   Survival; Successors and Assigns.** All covenants, agreements, representations and warranties of the Debtor which are contained in this Agreement shall survive the execution and delivery to Lender of the DIP Loan Documents and the making of the Loan hereunder and shall continue in full force and effect until all of the obligations under the DIP Loan Documents have been paid in full. All covenants, agreements, representations and warranties of the Debtor which are contained in this Agreement shall inure to the benefit of the successors and assigns of Lender. The Debtor shall not have the right to assign its rights or obligations under this Agreement without the prior written consent of Lender, except as provided in Section 6.02.A hereof.

**Section 8.9   Use of Terms.** The use of the singular herein shall also refer to the plural, and vice versa.

**Section 8.10   Headings.** The headings and sub-headings contained in this Agreement are intended to be used for convenience only and do not constitute part of this Agreement.

**Section 8.11   Severability.** If any term, provision or condition, or any part thereof, of this Agreement or the other DIP Loan Documents shall for any reason be found or held invalid or

unenforceable by any governmental agency or court of competent jurisdiction, such invalidity or unenforceability shall not affect the remainder of such term, provision or condition nor any other term, provision or condition, and this Agreement and any other DIP Loan Documents shall survive and be construed as if such invalid or unenforceable term, provision or condition had not been contained therein.

Section 8.12  **Binding Effect.**  This Agreement shall become effective when it shall have been executed by both the Debtor and Lender and thereafter shall be binding upon and inure to the benefit of the Debtor and Lender and their respective successors and assigns.

Section 8.13  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same document.   Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ALASKA DISPATCH NEWS, LLC.

By: _____

Title: _____

BINKLEY COMPANY, LLC

By: _____

Ryan Binkley
managing member

Effective Date: _____ to be filled in by LENDER

Alaska Dispatch New, LLP
Cash collateral budget

| Bank Cash Forecast | End of Day | 8/11/2017 | 5 | < -Days of week left | | Days of month | |
|---|---|---|---|---|---|---|---|
| Northrim balances | | | | **Wells Fargo checking #5143** | | | |
| Checking #5908 | | 57,065 | | Balance per bank | | 50,924 | |
| Depository #5080 | | | | O/S cks EoD | 8/11/2017 | (34,450) | |
| **Total Northrim cash** | | 57,065 | | WF 2004 | | 21,203 | |
| | | | | Adjusted balance | | 37,677 | |
| | | | | | reserve desired | - | |
| **Wells Fargo General Checking-net** | | 37,677 | | <----- Net of reserve | | 37,677 | |
| Cash available after reserve | | 94,742 | | | | | |
| Net receipts/(disburse) week remaining | | 120,858 | | | | | |
| Est. end of week ending 11/11 | | 215,600 | | | | | |

| Week ending | | **8/18** | **8/25** | **9/1** | **9/8** | **9/15** | **9/23** | **9/30** |
|---|---|---|---|---|---|---|---|---|
| Est. cash balances - net of reserve (beg of week) | | 94,742 | 215,600.25 | 88,330.00 | 50,167.43 | 19,399.21 | 121,399.21 | (175,224.06) |

| Cash receipts/(disbursements): | | **Current week** | | | | | | |
| | Week of | **8/18** | **8/25** | **9/1** | **9/8** | **9/15** | **9/23** | **9/30** |
| Disbursements | Est. daily | | | | | | | |
| Postage | 5,000 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| Payroll | | - | 380,000.00 | - | 360,000.00 | - | 380,000.00 | - |
| Carriers | | 80,000.00 | - | 80,000.00 | - | 80,000.00 | - | 80,000.00 |
| Health & DI & VSP insur | | 262,556.99 | - | 165,000.00 | - | - | - | 165,000.00 |
| G/L & other insur/Prop Taxes | | - | 28,258.15 | - | - | - | - | - |
| Workers Comp insur | | 26,623.27 | 26,623.20 | - | - | - | 26,623.27 | - |
| Rent | | - | - | 120,000.00 | - | - | - | 120,000.00 |
| Credit card pmts | | - | 40,000.00 | 5,000.00 | 5,000.00 | - | 40,000.00 | 5,000.00 |
| Credit card fees | | 18,000.00 | - | - | - | 18,000.00 | - | - |
| AP run - balance | | 16,961.49 | 27,388.90 | 43,162.57 | 40,768.22 | - | - | - |
| Interest | | - | - | - | - | - | - | - |
| Additional pay requests | | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 150,000.00 | 150,000.00 | - |
| **Total disbursements** | | 554,141.75 | 652,270.25 | 563,162.57 | 555,768.22 | 273,000.00 | 621,623.27 | 395,000.00 |
| | 529,141.75 | | | | | | | |

| Cash receipts | Est. daily | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Checks - Advertising | 25,000 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | |
| Checks - Circulation | 5,000 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | |
| Credit card - Advertising | 20,000 | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 | |
| Credit card - Circulation | 5,000 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | |
| Wells Fargo deposits -Adv | 5,000 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | |
| Wells Fargo deposits -Circ | 5,000 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | |
| Other-adj Friday est.-CCs,WF | | - | - | - | - | - | - | |
| **DIP Loan** | | 350,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 50,000.00 | - | |
| **Total cash receipts** | 65,000 | 675,000.00 | 525,000.00 | 525,000.00 | 525,000.00 | 375,000.00 | 325,000.00 | |
| | | | | | | | | |
| Net cash receipts/(disbursements) | | 120,858.25 | (127,270.25) | (38,162.57) | (30,768.22) | 102,000.00 | (296,623.27) | |

| AP Check Run estimate: | | **Current week** | | | | | | |
| | Week of | **8/14-8/18** | **8/21-8/25** | **8/28-9/1** | **9/4-9/8** | **9/11-9/15** | **9/18-9/23** | **9/25-9/30** |
| AP Cash Requirements | | | | | | | | |
| Due Date: | | 8/11/17 | 8/18/17 | 8/25/17 | 9/1/17 | 9/8/17 | Estimate | Estimate |
| Amt due on Due Date | | 22,436.09 | 49,824.99 | 121,245.71 | 162,013.93 | 162,013.93 | 160,000.00 | 160,000.00 |
| less est. prior AP run pmts | | - | 16,961.49 | 16,961.49 | 16,961.49 | 16,961.49 | - | - |
| less est. prior AP run pmts | | - | - | 27,388.90 | 27,388.90 | 27,388.90 | - | - |
| less est. prior AP run pmts | | - | - | - | 43,162.57 | 43,162.57 | - | - |
| less/(add) other  GCI NW rent/BC | | - | - | - | - | - | - | - |
| (Add) & move up | | - | - | - | - | - | - | - |
| Total due per Cash Requirements - net | | 22,436.09 | 32,863.50 | 76,895.32 | 74,500.97 | 74,500.97 | 160,000.00 | 160,000.00 |

| Less AP Holds/Due Date Adjustments/: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Taxes | | - | - | 28,258.15 | 28,258.15 | 28,258.15 | 28,258.15 | - |
| Incl'd in detail above-carriers | | 5,474.60 | 5,474.60 | 5,474.60 | 5,474.60 | 5,474.60 | 5,474.60 | |
| Total Holds and Paid w/ date adj | | 5,474.60 | 5,474.60 | 33,732.75 | 33,732.75 | 33,732.75 | 33,732.75 | |
| | | | | | | | | |
| **AP run from the Cash Requirements report** | | 16,961.49 | 27,388.90 | 43,162.57 | 40,768.22 | 40,768.22 | 126,267.25 | |

| Additional pay requests: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Additional AP postings | | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 150,000.00 | 150,000.00 | |
| **Total additional pay requests** | | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 | 150,000.00 | 150,000.00 | |

**UCC SEARCH REQUEST**                                              **2017-0556**


REQUESTED NAME:   ALASKA DISPATCH NEWS LLC

EMAIL:            CABOT@CCLAWYERS.NET
RECEIVED DATE:    8/10/2017
PROCESSED DATE:   8/11/2017
RECEIPT NUMBER:   4266748




The undersigned filing officer hereby certifies that the preceding page(s) are a listing of all ACTIVE and/or WILDCARD filings which name the above debtor and which are on file in the UCC CENTRAL FILE SYTEMS district.


As of:      8/10/2017 4:00:00 PM


Signed:     *Navetta Jackson*
            _____
            Recorder II



NOTE: UCC documents are shown as 'active', 'lapsed', or 'wildcard'. Filings generally remain active in our system for one year after the lapse, even if terminated before the lapse data. If a filing is not continued within the designated time, the filing status will change from 'active' to 'lapsed' for one year. Review search results carefully.

(A 'wildcard' reference means the filing does not tie to an 'active' filing; and, a filing shown as 'active' does not necessarily mean effective.)



**State of Alaska**
**Department of Natural Resources**
**UCC Central File System**
**550 West 7th Avenue Suite 1200A**
**Anchorage, AK 99501-3364**
**907-269-8873**

Exhibit C
Page 1 of 6

**ALASKA DISPATCH NEWS LLC**
Page 2


| | | |
|---|---|---|
| DOCUMENT: | 2017-006025-5 | DEBTOR: |
| ASSOC DOC: | 2017-006025-5 | ALASKA DISPATCH NEWS LLC |
| STATUS: | ACTIVE | PO BOX 149001 |
| DESCRIPTION: | FINANCING STATEMENT | ANCHORAGE, AK 99514 |
| DATE: | 04/05/2017 | |
| TIME: | 12:49 | SECURED: |
| | | NORTHRIM BANK |
| | | PO BOX 241489 |
| | | ANCHORAGE, AK 995241489 |


------------------------------------- END OF SEQUENCE -------------------------------------


| | | |
|---|---|---|
| DOCUMENT: | 2017-014890-8 | DEBTOR: |
| ASSOC DOC: | 2017-014890-8 | ALASKA DISPATCH NEWS LLC |
| STATUS: | ACTIVE | P. O. BOX 149001 |
| DESCRIPTION: | FINANCING STATEMENT | ANCHORAGE, AK 995149001 |
| DATE: | 08/10/2017 | |
| TIME: | 1:38 | SECURED: |
| | | J BIRKET INC |
| | | 211 MCCOWN DR |
| | | LEBANON, TN 37087 |

COMMENTS:     170801UZ7CC - RCPT: 4266508


------------------------------------- END OF SEQUENCE -------------------------------------


**State of Alaska
Department of Natural Resources
UCC Central File System
550 West 7th Avenue Suite 1200A
Anchorage, AK 99501-3364
907-269-8873**

Exhibit C
Page 2 of 6

**2017 – 006025 – 5**

Recording District 500 UCC Central File
04/05/2017 12:49 PM      Page 1 of 1

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Marion@261-3320, Ln.# 7102123150

**B. E-MAIL CONTACT AT FILER (optional)**
marion.andres@nrim.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

NORTHRIM BANK
3111 C STREET
ANCHORAGE, AK 99524-1489

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Alaska Dispatch News, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO Box 149001 | Anchorage | AK | 99514 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NORTHRIM BANK | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3111 C Street, PO Box 241489 | Anchorage | AK | 99524-1489 | USA |

**4. COLLATERAL:**  This financing statement covers the following collateral:

All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

**7.** ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8.** OPTIONAL FILER REFERENCE DATA:
Central Recording District Filing $20.00

Exhibit C

2017-014890-8

A
S
K
A

Recording District 500 UCC Central File
08/10/2017 01:38 PM          Page 1 of 3

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Clayton Walker 907-375-9277**

B. E-MAIL CONTACT AT FILER (optional)
**chwalker@aloinc.com**

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Alaska Law Offices, Inc.
240 E Tudor Rd Ste 230
Anchorage, AK 99503**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME **Alaska Dispatch News, LLC** | | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **P. O. BOX 149001** | CITY **Anchorage** | STATE **AK** | POSTAL CODE **995149001** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME **J. Birket, Inc.** | | | | |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **211 McCown Dr** | CITY **Lebanon** | STATE **TN** | POSTAL CODE **37087** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

### See Exhibit A

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☑ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Exhibit C
Page 4 of 6

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| **Alaska Dispatch News, LLC** |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**10. DEBTOR'S NAME:** Provide (10a or 10b) only *one* additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** *or* ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only *one* name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest)

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

**Exhibit A** page: 1 of 1

Columbus, IN 850/Urbanite press equipment as configured, including:
1-12 DGM 850 Unites 22-3/4" cutoff;
2-Goss Urbanite Unites 22-3/4" Cutoff;
3-Urbanite folder with Quarter folder;
4-Urbanite upper former;
5-DGM Folder with 1 high former;
6-Six (6) Jardis Pasters;
7-Enkel Splicer;
8-CCI auto Register system with Motorization and Cameras for (4) webs;
9-GMI remote inking and preset system;
10-Pressroom products spray dampening system;
1-Four (4) Ink Pumps and piping;
1- Spare parts, drawings and press documentation

Exhibit C
Page 3 of 3
Page 5 of 6
2017-014890-8

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Case No. A17-00285 |
| ALASKA DISPATCH NEWS, LLC, | : | Chapter 11 |
| | : | |
| Debtor. | : | |
| | : | |

### ORDER APPROVING DEBTOR IN POSSESSION LOAN &
### USE OF CASH COLLATERAL

Alaska Dispatch New, LLC  as debtor-in-possession ("Debtor"), filed a Motion to Approve Debtor in Possession Financing on August 14, 2017 at DE X.  The Affidavits of xxx and yyy were filed in support of the Motion.  A Certificate was filed at DE   showing that Notice of the Motion was given by personal service, facsimile or email, with telephonic confirmation, to any lessor, creditor or other party with a specific legal interest in the property of the Debtor

A hearing on the Motion was held on August 14, 2017 at which XX XX & YY  YY testified for the Debtor in support of the Motion.   The affidavits and testimony established  the Debtor will run out of cash before August 18, 2017, that a large health insurance premium to Premera Insurance is due and that the Debtor will not be able to operate past August 18, 2017 without a debtor in possession loan.   It was also established at the hearing that the Debtor has no source of funding for its immediate cash needs other than Binkley Company, LLC which has offer to purchase the Debtor for $1,000,000.  Binkley Company, LLC's  purchase price will be reduced by all debtor in possession loans Binkley Company, LLC makes to Debtor between today and closing of the sale of the Debtor's assets to Binkley Company, LLC for $1,000,000.

A further condition of Binkley Company, LLC's proposed debtor in possession loan is that if the Debtor's assets are sold to a third party, because a third party offers more for the Debtor's assets then Binkley Company, LLC has offered, then Binkley Company, LLC will receive up to $100,000 of reimbursement of expenses and a 3% fee calculated on the prevailing offer for the Debtor's assets, from the proceeds of the purchase price.

Binkley Company, LLC's offer to provide debtor in possession financing is conditioned on it receiving a 11 U.S.C. 364(d)(1) super priority lien on all property of the Debtor subject to the effect of any liens on such equipment located in the Arctic Blvd location.

IT IS ORDERED

The Debtor in Possession Credit Agreement filed at DE   is approved subject to the following:

1.      In exchange for an immediate loan of $350,000 and the further commitments in the Agreement, Binkley Company,  LLC is granted a lien under 11 U.S.C. 364(d) senior to the lien of Northrim Bank on all of Debtor's property.  This lien is not senior to or equal to any enforceable recorded liens against Debtor's property located in the Arctic Blvd location.

2.      Northrim Bank has consented to this treatment.

3.      Binkley Company, LLC's requirement that as a condition of this and further loans it will receive a break up fee of 3% of gross sale proceeds and up to $100,000 of its costs paid from the sale proceeds of the prevailing purchase offer for the Debtor's assets is approved, but is subject to further consideration if there are any objections to

such treatment filed within 10 days of the mailing of notice to the matrix of this condition.

4.      A continued hearing on this Motion will be scheduled on or before August 30, 2017 and Binkley Company, LLC does not need to make further advances under the DIP Agreement until it is satisfied that the conditions set for in the DIP Agreement have been or will be met.  Binkley Company, LLC retains the right to not advance further funds under the DIP Agreement for any reason.

5.      Debtor is authorized to use cash collateral and any loan proceeds it receives from Binkley Company, LLC for the expenses set forth in the budget, attached to this Order.

6.      The Court finds that Binkley Company, LLC is a good faith lender  for the purposes set forth in 11 U.S.C. 364(e) and 363(m).

August     , 2017

Gary Spraker
United States Bankruptcy Judge

Cabot Christianson, Esq.
Alaska Bar No. 7811089
LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 W. 8th Avenue, Suite 201
Anchorage, Alaska 99501
(907) 258-6016
cabot@cclawyers.net

Attorneys for Debtor

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ALASKA DISPATCH NEWS, LLC, | ) | **Case No.: 17- 00285** |
| | ) | Chapter 11 |
| Debtor. | ) | |

## ORDER APPROVING USE OF CASH COLLATERAL

Debtor filed its Chapter 11 petition in this case on August 12, 2017 ("Petition

Date"), and at Docket _____ filed a motion ("the Motion") authorizing uses of cash

collateral.  A hearing on the Motion was held August ___, 2017.  Good cause appearing,

IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED, as follows:

1.     **Cash Collateral.**  As used in this Order, the term "Cash Collateral" means

all cash and cash equivalents that constitute Collateral, or proceeds thereof, as defined in

11 U.S.C. Section 363(a).

2.     **Creditors claiming an interest in Cash Collateral.**  Subject to paragraph

6 herein, this Order assumes, but does not find, that (1) Northrim Bank ("Northrim")

holds a valid first position security interest in Debtor's Cash Collateral, and (2) no other

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

creditor holds or claim to hold a security interest in Debtor's Cash Collateral.  To the extent that either of these assumptions prove to be incorrect, the protections afforded Northrim may be modified by this Court upon notice to all affected parties.

3.    **Use of Cash Collateral.**    Subject to the terms of this Order, Debtor may, from the time of commencement of this case until Termination of this Order, utilize its Cash Collateral, for the expenses set forth in the Budget attached hereto as Exhibit A. Debtor may not utilize Cash Collateral for purposes not listed in Exhibit A.

4.    **Termination of this Order.**  Termination of this Order occurs on the earliest of the following (a) September 3, 2017, (b) entry of any order of this Court which amends or terminates this Order, (c) conversion of this case to chapter 7, or (d) Debtor ceases to do business.

5.    **Post-Petition Lien.**  To provide adequate protection to Northrim for Debtor's use of Cash Collateral granted herein, Northrim shall have a post-petition lien on Debtor's Cash Collateral, on all other post-petition assets of the Debtor in which Northrim holds a valid perfected lien or would hold a valid perfected lien but for Section 552.  Such lien shall be retroactive to the time of commencement of this case, and shall cover all property that exists as of the Termination of this Order; however it shall be subject and junior to the security interest grated to the Binkley Company, LLC, by separate order of this Court.

6.    **Administrative Claim.**  In the event that the post-petition lien granted herein does not provide Northrim with collateral of a value equal to the value of any Cash Collateral consumed by the Debtor pursuant to this Order, Northrim shall have an

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

administrative claim under Section 507(a)(1) for such shortfall between the value of

Northrim's collateral on the petition date and the value of such collateral as of the

Termination of this Order.

7.      **Carveout.**  The question of whether the post-petition lien and the

administrative claim granted to Northrim in this Order shall be subject to a Carveout in

favor of Debtor's court-approved professionals for work performed by them while this

case is in Chapter 11, and the terms and conditions of any such Carveout, if any, shall be

reserved until further order of this Court upon proper motion and notice.  Any such

subsequent order may be retroactive to the Petition Date.

8.      **Modification.**  Any party may, upon reasonable notice to the others, move

for an order expressly terminating or modifying this Cash Collateral Order.  Nothing

herein shall limit any right of Northrim, or any other party, to elect to seek further

adequate protection under Bankruptcy Code §361 or §363, to seek relief from the

automatic stay under Bankruptcy Code §362, or to seek any other relief from the Court at

a future time.

Dated August ____, 2017.

_____
Gary Spraker
Bankruptcy Court Judge

PAGE 3:       ORDER APPROVING USE OF CASH COLLATERAL
              H:\3307\MAIN\ORDER APPROVING USE OF CASH COLLATERAL.WPD